IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| BENJAMIN FETTKETHER,<br><br>　　　　　　Plaintiff/Counter-<br>　　　　　　defendant,<br><br>vs.<br><br>PROGRESSIVE NORTHWESTERN<br>INSURANCE COMPANY,<br><br>　　　　　　Defendant/Counter<br>　　　　　　claimant. | CV 23-18-BLG-SPW<br><br><br>ORDER |

Before the Court are cross-motions for summary judgment filed by Plaintiff/Counter-defendant Benjamin Fettkether and Defendant/Counterclaimant Progressive Northwestern Insurance Company ("Progressive"). (Docs. 16, 19). This dispute stems from Progressive's refusal to defend against Fettkether's lawsuit against the insured, Sully Weinreis, for Fettkether's injuries resulting from an accident involving Weinreis's 2017 Can-Am Maverick X3 ("X3"). Fettkether argues that in refusing to defend Weinreis, Progressive breached its duty to defend— and is therefore liable for all defense costs and judgments—because the X3 is a Covered Auto under Weinreis's policy with Progressive. (Doc. 20 at 22). Progressive contends that it never had the duty in the first place because the X3 is not a Covered Auto under the policy. (Doc. 20 at 22; Doc. 17 at 9).

1

After the motions were fully briefed, the Court ordered the parties to file supplemental briefing on the X3's design, since the X3's design is a key component of whether it is covered under Weinreis's policy with Progressive. The parties timely filed their supplemental briefs. (Docs. 25, 26).

Having reviewed the filings pertinent to the motions, the Court grants summary judgment in favor of Fettkether because Progressive failed to unequivocally demonstrate that the policy could not have covered the X3 and that it had no duty to defend Weinreis. It denies Progressive's motion for the same reason.

## I.    Background

On April 2, 2021, Weinreis bought the X3, a utility terrain vehicle, or UTV.[1] (Doc. 12 at 2). The next day, Weinreis was driving the X3 with Fettkether in the passenger seat when he took a turn too fast and rolled the X3. (*Id.*). Fettkether's right hand was crushed and degloved in the accident. (*Id.*).

At the time, Weinreis had an automobile insurance policy with Progressive ("the Policy") for the period between March 12, 2021, to September 12, 2021. (Doc. 18-2). The Policy provides bodily injury coverage for up to $25,000 for any accident involving a "Covered Auto." (*Id.* at 1–2, 11). A Covered Auto includes any "Auto" listed on the Policy's declaration page and any "Additional Auto." (*Id.* at 7). The

---

[1] A UTV is a type of side-by-side. (Doc. 25-1 at 3).

Policy's declaration page lists two vehicles—a 2004 Chevrolet Silverado truck and a 1987 Ford Mustang. (*Id.* at 1–2).

An "Additional Auto" is defined as: an auto [the insured] becomes the owner of during the policy period that does not permanently replace an auto shown on the declarations page if: a. [Progressive] insure[s] all the other autos [the insured] own[s]; b. the additional auto is not covered by any other insurance policy; c. [the insured] notif[ies] [Progressive] within 30 days of becoming the owner of the additional auto; and d. [the insured] pay[s] any additional premium due." (*Id.* at 7). An "Auto" is a "land motor vehicle: a. of the private passenger, pickup body, or cargo van type; b. designed for operation principally upon public roads; c. with at least four wheels; and d. with a gross vehicle weight rating of 12,000 pounds or less, according to the manufacturer's specifications." (*Id.*). If a vehicle meets the definition of an additional auto, it is considered a Covered Auto under the Policy.

Following the accident, Fettkether sued Weinreis for negligence in the Thirteenth Judicial District Court in Yellowstone County, Montana. (Doc. 18-1). Fettkether also demanded Progressive tender the $25,000 bodily injury limit. (Doc. 12 at 2). On December 9, 2021, Progressive rejected the demand and refused to provide Weinreis with a defense on the grounds that the X3 was not an Auto, and therefore not a Covered Auto and not insured under the policy. (Doc. 18-3 at 1). In its denial letter, Progressive explained that, based on the X3's owner's manual, the

3

X3 was not an Auto, and therefore not a Covered Auto, because the X3 is not designed for operation principally upon public roads. (*Id.* at 1). Progressive specifically noted that the "owner's manual described the [X3] as an 'Off-Road' vehicle that is not designed for use on paved roads. The owner's manual also warns against operation on paved roads and even warns of operation on dirt or gravel roads." (*Id.*). Progressive also stated that the X3 lacked "safety equipment required for vehicles designed for use principally on public roads such as rear safety bumper, horn, mirrors." (*Id.*). Progressive did not file a declaratory judgment action to determine coverage. (Doc. 12 at 3).[2]

Weinreis and Fettkether agreed that Weinreis would enter a Confession of Judgment for $1.6 million and assign his rights arising from the Policy to Fettkether. (Doc. 12 at 3; Doc. 12-5). Fettkether agreed not to execute judgment against Weinreis's personal assets. (Doc. 12 at 3; Doc. 12-6). After a hearing, Judge Moses

---

[2] Progressive also denied Weinreis's claim under a motorcycle policy that Weinreis had purchased three days after the accident. (*Id.* at 4). Progressive denied it on the grounds that the policy was not effective at the time of the accident. (*Id.*). Fettkether concedes that the policy did not apply because it was purchased after the accident. (Doc. 20 at 11). However, the parties also each argue that Weinreis's purchase of the motorcycle policy implies some relevant mental state. According to Progressive, the purchase indicated that Weinreis knew that the X3 was not covered by the Policy. (Doc. 22 at 4). Fettkether asserts that the purchase was pursuant to the requirement in the Policy that Weinreis notify Progressive within 30 days of a newly acquired vehicle for it to constitute a covered auto. (Doc. 20 at 21). Neither provide evidence of those assertions, so the Court finds both arguments speculative and irrelevant.

of the Thirteenth Judicial District found the settlement was reasonable.  (Doc. 12-7).

Progressive did not attend the hearing.  (Doc. 12 at 3).

Fettkether filed the instant suit against Progressive in this Court on March 1,

2023.  (Doc. 1).  Fettekther seeks a declaration that Progressive had a duty to defend

Weinreis and that Progressive breached its duty by failing to defend against

Fettkether's negligence action on Weinreis's behalf.  (*Id.* at 4–5).  Fettkether seeks

$1.6 million in contractual damages, interest on the judgment until paid, attorney

fees and costs, and other relief the Court deems appropriate.  (*Id.* at 6).

## II.   Discussion

### A.   *Legal Standard*

Summary judgment is appropriate under Rule 56(c) where the moving party

demonstrates the absence of a genuine issue of material fact and entitlement to

judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477

U.S. 317, 322 (1986).  The party seeking summary judgment always bears the initial

burden of establishing the absence of a genuine issue of material fact.  *Celotex*, 477

U.S. at 323.  To meet this burden, the movant must identify those portions of "'the

pleadings, depositions, answers to interrogatories, and admissions on file, together

with the affidavits, if any,' which they believe demonstrate the absence of a genuine

issue of material fact."  *Id.* (citing Fed. R. Civ. P. 56(c)(1)(A)).  If the moving party

meets their initial responsibility, the burden then shifts to the opposing party to

5

establish that a genuine issue as to any material fact actually exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). When making this determination, the Court must view all inferences drawn from the underlying facts in the light most favorable to the non-moving party. *See id.* at 587.

B.    *Duty to Defend*

The Court's jurisdiction over this action is based on diversity of citizenship. Thus, the Court must apply the substantive law of Montana. *Med. Lab'y Mgmt. Consultants. v. Am. Broad. Cos., Inc.*, 306 F.3d 806, 812 (9th Cir. 2002). In Montana, the interpretation of an insurance contract is a question of law. *Scentry Biologicals, Inc. v. Mid-continent Cas. Co.*, 319 P.3d 1260, 1264 (Mont. 2014).

Insurers have two duties to their insured: the duty to defend and the duty to indemnify. *Farmers Union Mut. Ins. Co. v. Staples*, 90 P.3d 381, 385 (Mont. 2004). An insurer generally has a duty to defend an insured when a complaint alleges facts which represent a risk covered by the terms of an insurance policy. *Id.* The duty to indemnify only arises if the policy "actually covers the alleged harm." *Skinner v. Allstate Ins. Co.*, 127 P.3d 359, 364 (Mont. 2005). Accordingly, there is no duty to indemnify without a duty to defend, but there can be a duty to defend even if there is no duty to indemnify. *Id.* at 363. An insurer is not obligated to defend when there is clearly no coverage. *Staples*, 90 P.3d at 385.

6

In determining whether a duty to defend exists, the insurer must view the facts from the perspective of the insured and narrowly construe any exceptions. *Id.* "Any ambiguity in an insurance policy must be construed against the insurer." *Huckins v. United Servs. Auto. Ass'n*, 396 P.3d 121, 124 (Mont. 2017) (internal citation and quotation omitted). "An ambiguity exists when the contract taken as a whole in its wording or phraseology is reasonably subject to two different interpretations." *Id.* (internal citation and quotation omitted).

The insurer has a duty to defend unless there is an "unequivocal determination that the claim against an insured does not fall within the insurance policy's coverage." *Staples*, 90 P.3d at 385. If the "insurer refuses to defend a claim and does so unjustifiably, the insurer is estopped from denying coverage and becomes liable for defense costs and judgments." *Tidyman's Mgmt. Servs. Inc. v. Davis*, 330 P.3d 1139, 1149 (Mont. 2014). This liability includes judgments in excess of policy limits. *Id.* at 1150. "In other words, where the insurer refuses to defend its insured, it does so at its peril." *Tidyman's*, 330 P.3d at 1149.

Because of the high bar insurers must meet to justify a refusal to defend, the Montana Supreme Court has cautioned that even where an insurer believes there is no coverage or questions concerning coverage, the "prudent course of action is to defend the insured under a reservation of rights and file a declaratory judgment action to discern coverage." *Id.*

7

Courts have identified five categories of duty to defend from the Montana Supreme Court's jurisprudence:

(1) "the complaint clearly alleges facts that come within the coverage of the liability policy. This scenario requires the insurer to defend its insured with no need to look beyond the allegations in the complaint." *Revelation Indus., Inc. v. St. Paul Fire & Marine Ins. Co.*, 206 P.3d 919, 923 (Mont. 2009) (citing *Atcheson v. Safeco Ins. Co.*, 527 P.2d 549 (Mont. 1974));

(2) "the complaint alleges facts that do not come within the coverage of the liability policy and the insurer has no knowledge of any other facts that could result in coverage. Under these circumstances, we have held that the insurer has no duty to defend its insured." *Id.* (citing *McAlear v. St. Paul Ins. Cos.*, 493 P.2d 331 (Mont. 1972));

(3) "the complaint alleges facts that come within the coverage of the liability policy, but the insurer knows of other actual facts that negate coverage. This scenario relieves the insurer of its duty to defend." *Id.* (citing *Burns v. Underwriters Adjusting Co.*, 765 P.2d 712 (Mont. 1988)).

(4) the complaint alleges no facts that would compel coverage under the policy, but the insurer has actual knowledge of the facts that could result in coverage. In this scenario, the insurer has a duty to defend. *See e.g. id.* at 928; and

(5) there is a genuine dispute as to the facts relevant to coverage. In this scenario, the dispute must be resolved in favor of finding a duty to defend. *See e.g. Emps. Mut. Cas. Co. v. Hansen*, CV 19-114-BLG, 2021 WL 961775, at *5 (D. Mont. Mar. 15, 2021) (citing *Staples*, 90 P.3d at 385–86).

With respect to what an insurer can consider in determining whether it has a duty to defend, Fetterkether avers that the insured "is bound by the four corners of the underlying Complaint and the four corners of the policy." (Doc. 26 at 2). This

8

is incorrect.  In *Burns*, the Montana Supreme Court expressly rejected the plaintiff's argument that "the allegations in the complaint alone are to be used to determine the duty to defend." *Revelation Indus.*, 209 P.3d at 925 (discussing 765 P.2d at 713). Rather, *Burns* held that "the proper focus of inquiry is the acts giving rise to coverage, not the language of the complaint." *Burns*, 765 P.2d at 713.  Thus, when it is apparent that the allegations in a complaint are "either incomplete or inaccurate, given the facts or questions of fact presented[,]" insurers (and by extension, the court) can look beyond the four corners of the complaint.  *Revelation Indus.*, 206 P.3d at 925–26.  The insurer "does so at its own risk," meaning that if it discovers facts that affirm or raise the possibility that coverage exists, it must consider such information in making its decision of whether to tender a defense, even if the complaint fails to allege such facts.  *Id.*  Scenario (3) above reflects this rule.  206 P.3d at 923.  At the same time, Fettkether is correct that an insurer cannot introduce, nor can the Court consider, for the first time in the litigation evidence that may negate coverage that was acquired after the denial of defense.

Accordingly, in determining whether the insurer had a duty to defend the insured, the Court first looks to the terms of the policy, then to the facts alleged in the complaint, and then to the facts not contained in the complaint that the insurer considered in refusing to defend the insured.  *See Huckins*, 396 P.3d at 124.

*Huckins* is helpful to illustrate when an insurer both meets and fails to meet the unequivocal demonstration standard. *Id.* On January 29, 2014, Barry Van Sickle accepted an offer from the plaintiff to sell his house. *Id.* at 122. On the seller's property disclosure statement form next to the request that the seller "describe any Adverse Material Facts concerning the items listed or other components, fixtures or matters," Van Sickle wrote "N/A." *Id.* However, the basement previously had flooded. *Id.* The plaintiff discovered the past flooding during the pre-closing inspection but closed anyway in March 2014. *Id.* at 123. After closing, the plaintiff found the basement flooded. *Id.* at 123. The plaintiff sued Van Sickle for failing to disclose the past flooding issues. *Id.*

Van Sickle had three insurance policies through the defendant, United Services Automobile Association ("USAA"). *Id.* The first, a homeowner's insurance policy, was valid from sometime in 2001 to January 3, 2014. *Id.* The second, another homeowner's insurance policy, was valid from January 4, 2014, to January 5, 2015, and contained an exclusion for damages "arising out of [the insured's] failure, intentionally or unintentionally, to disclose information regarding the sale or transfer of real or personal property." *Id.* The third, a renter's policy valid from March 15, 2014, to March 15, 2015, covered property damages caused by an occurrence, which was defined as an accident, "including continuous or repeated exposure to substantially the same general harmful conditions" during the

10

policy period. *Id.* at 126.  The renter's policy did not contain a failure to disclose exclusion. *Id.*

USAA refused to defend under all three policies. *Id.* at 123.  The plaintiff settled with Van Sickle by way of a consent judgment of $300,000, then sued USAA for breach of the duty to defend under the policies.   *Id.*  As to the first homeowner policy, the Court found USAA had no duty to defend because it was unequivocal that the policy was not valid during the events giving rise to the complaint: the policy expired on January 3, 2014, while the offer and sale occurred on January 28 and 29, 2014, respectively. *Id.* at 125.  As to the second homeowner policy, the Court also found no duty to defend because the complaint's eight claims all concerned Van Sickle's failure to disclose the flooding problem during the sale of his house.  *Id.* Such claims unambiguously fell under the policy's exception for damages arising from the policyholder's failure to disclose information regarding the sale or transfer of real property. *Id.*

However, the Court found USAA had breached its duty to defend under the renter's policy because (1) the complaint alleged facts that, if proven, would fall under the policy (*i.e.* property damage that occurred during the policy period as a result of the flooding found at closing), and (2) whether, based on Van Sickle's interview, Van Sickle acted intentionally or accidentally in providing an inaccurate answer about the flooding in the disclosure form was too disputed based on USAA's

interview with Van Sickle for the Court to conclude that it was unequivocally an accident and therefore covered under the policy. *Id.* at 127. The Court explained:

> It could be argued in an indemnification case that, whatever the content of their answers, the insureds intended to provide the answers, and thus acted intentionally, not accidentally, which did not constitute an "occurrence." However, here we consider the duty to defend, and such nuanced arguments about intent make it impossible to conclude that there was "an unequivocal demonstration" that Huckins' claims fell outside the Renter's Policy.

The court ended its order with a reminder that the "prudent course of action is to defend under a reservation of rights and file a declaratory action to resolve the coverage question." *Id.* at 128 (internal citations and quotations omitted).

### C.   *Progressive's Duty to Defend*

Progressive argues that the X3 does not meet the definition of an Auto, and thus a Covered Auto for which the Policy would provide bodily injury coverage, because it is an "off-road vehicle" and not designed for operation principally on public roads. (Doc. 17 at 4, 9). Progressive analogizes to *Economy Preferred Insurance Company v. Rodgers*, No. C18-1589, 2019 WL 5212806 (W.D. Wash. 2019), in which the court held that an ATV was not a Covered Auto. (Doc. 16 at 5).

Fettkether disagrees, asserting that Progressive cannot meet the "high bar" of the unequivocal demonstration standard because it cannot be said that the X3 "could never have been an 'Auto' as defined in the relevant policy." (Doc. 20 at 7). Rather, according to Fettkether it is, at minimum, ambiguous and, at best, unequivocal that

a UTV like the X3 could be designed to operate on public roads. (*Id.* at 14). Fettkether goes on to cite various Montana caselaw about the wide range of types of "public roads," which generally speak to whether the road is publicly or privately owned/accessible. (*Id.* at 14–17). Fettkether further argues that even if the Court accepts Progressive's definition of a public road as only paved streets, Montana law permits UTVs to be driven on public highways, and thus they can primarily be used for city driving. (*Id.* at 18–19). Fettkether lastly distinguishes *Economy Preferred* based on the fact that the claim there was for declaratory judgment, not a breach of the duty to defend. (*Id.* at 19–20).

On supplemental briefing, Progressive attached the owner's manual for the X3 and quoted portions of it that stated the X3 was a "high-performance off-road" vehicle that a user should "[n]ever operate ... on any public street." (Doc. 25 at 1–2 (citing Doc. 25-1 at 9, 18)). Fettkether declined to address the specific features of the X3 because "Progressive cannot now introduce – nor can the Court consider – any evidence that may negate coverage acquired after its denial of a defense." (Doc. 26 at 2). Instead, Fettkether argued that the Court should focus its analysis on whether Progressive unequivocally demonstrated that there was no "*potential* for coverage," not whether coverage in fact existed. (*Id.* at 4 (quoting *Tidyman's*, 330 P.3d at 1150) (emphasis in *Tidyman's*)).

The lynchpin issue here is whether Progressive unequivocally demonstrated that no coverage could exist because the X3 was not "designed for operation principally upon public roads." (Doc. 18-2 at 7; Doc. 18-3 at 2). To answer this question, the Court first looks at the Policy, which it described at length in the Background. Importantly, the Policy does not define "public roads" or specify what design features would make a vehicle considered designed for operation principally upon public roads.

Next, looking to the Complaint, Fettkether claims that his injuries stemmed from the operation of a Covered Auto. Thus, if proven, his claims would fall under the policy. However, Fettkether does not comment on the X3's design or its suitability for operation principally upon public roads. Rather, the Complaint only details the accident, Fettkether's injury, Fettkether's request that Progressive tender the Policy's $25,000 bodily injury limit, and the subsequent litigation. (Doc. 1). The complaint is insufficient on its face for the Court to conclude that a duty to defend existed. *See Town of Geraldine v. Mont. Mun. Ins. Auth.*, 198 P.3d 796, 800–01 (Mont. 2008) ("We have repeatedly held that it is the acts giving rise to the complaint which form the basis for coverage, not the complaint's legal theories or conclusory language.") (internal citations omitted).

The Court last looks to the facts considered by Progressive in refusing to defend, which are outlined in Progressive's denial letter. (Doc. 18-3). The denial

14

letter states that during Progressive's investigation, it reviewed the owner's manual for the X3 and the requirements of the vehicle to operate on public roads. (*Id.* at 1). Progressive summarized that the owner's manual describes the X3 "as an 'Off-Road' vehicle which is not designed for use on paved roads. The owner's manual also warns against operation on paved roads and even warns of operation on dirt or gravel roads." (*Id.*).   Progressive also notes that the X3 "lacks the safety equipment required for vehicles designed for use principally on public roads such as a rear safety bumper, horn, mirrors." (*Id.*).

Since Progressive considered the X3 owner's manual in its investigation, the Court also will look to the owner's manual.  The owner's manual explains that the X3 is a "high-performance off-road vehicle," as Progressive's denial letter stated. (Doc. 25-1 at 11).  The owner's manual also cautions, "Never operate this vehicle on any public street, road or highway, even dirt or gravel ones. Riding your vehicle on roads or highways could result in a collision with another vehicle. This vehicle is not designed for operation on roads … In many jurisdictions it is not legal to operate this vehicle on public roads." (*Id.* at 20).

Based on the Court's reading of the Policy, Complaint, denial letter, and the owner's manual, the Court finds that Progressive failed to make an unequivocal demonstration that the X3 was not designed for operation principally upon public roads and could never be a Covered Auto under the Policy.  Progressive's denial

letter repeatedly references the unsuitability of the X3 for operation on paved, dirt, or gravel roads, but it does not state that such unsuitability also means that the X3 is unsuitable for operation on a public road. Nor is "public road" defined as a paved, dirt, or gravel road anywhere in the Policy.[3] The ambiguity of "public road" in the Policy, the inconsistencies between the language evoked in the Policy and the denial letter, and the obligation that the Court narrowly construe any exceptions to coverage preclude the Court from concluding that Progressive met the unequivocal demonstration standard.

The owner's manual bolsters the Court's conclusion. Progressive could have used the exact language regarding public roads from the owner's manual in its denial letter so that its word choice was consistent with the Policy and the owner's manual. Yet it did not. Instead, it toggled between paved, dirt, and gravel roads. Parsing out whether a paved, dirt, or gravel road equates to a public road when such ambiguity exists in the Policy is too "nuanced" of an argument for the Court to consider in a breach of a duty to defend case and "make[s] it impossible to conclude that there was 'an unequivocal demonstration'" that Fettkether's claims fell outside the Policy. *Huckins*, 396 P.3d at 128.[4] In contrast, like the first homeowner's insurance policy

---

[3] Fettkether's suggestion that "public road" could be understood as referring to public versus a private road is not a reasonable interpretation. Whether a road is accessible to the public has no bearing on the type of vehicle that can operate on it, only the type of persons that can go down it.
[4] The Court would like to clarify that it did not seek the owner's manual so it could analyze whether there was coverage under the Policy, as it would in a declaratory judgment action and as Fettkether seems to imply. (Doc. 26 at 2). Rather, the Court sought the owner's manual from the parties so

in *Huckins*, it is unequivocal that the motorcycle policy does not provide coverage because the accident occurred before the beginning of the coverage period.

The Court acknowledges that the denial letter states that the X3 lacks certain safety features that a motor vehicle designed for use principally on public roads must have. (Doc. 18-3 at 1). However, safety features are only one component of a design and, alone, cannot unequivocally demonstrate that the X3 was not a Covered Auto, particularly in light of the ambiguity presented by the statements regarding the suitability of the X3 for operation on certain types of roads.

Progressive's reliance on *Economy Preferred* is misplaced because the case concerns a declaratory judgment claim under the plaintiff's underinsured motorists coverage endorsement, not a breach of duty to defend claim.   Trial Motion, Memorandum and Affidavit, *Economy Preferred Ins. Co. v. Rodgers*, No. 2:18-cv-01589, 2019 WL 3557779 (W.D. Wash July 9, 2019).  Thus, the standard applied in *Economy Preferred* is not the unequivocal demonstration standard and allows for the nuanced analysis of whether coverage exists under the policy.   *Economy Preferred*, 2019 WL 5212806, at *3.

This case, like many presented to Montana state and federal courts, highlights the prudence that an insurer must undertake to not only uphold its duties under the

---

it could see first-hand what facts Progressive stated that it had considered, how those facts translated into a denial letter, and how the language compared to the Policy.

policies it underwrites but also avoid liabilities in excess of the policy limits.  Instead of filing a declaratory judgment action to determine coverage and only facing a potential judgment for, if anything, the Policy's $25,000 limit, Progressive is now bound to pay the $1.6 million Confession of Judgment plus interest and attorney fees and costs.  The Court hopes this case serves as yet another reminder to Progressive and similarly situated parties that the prudent course of action is always to proceed under the reservation of rights clause and file a declaratory judgment action.

## III.   Conclusion

Accordingly, IT IS SO ORDERED that Plaintiff/Counter-defendant Benjamin Fettkether's Cross Motion for Summary Judgment (Doc. 19) is GRANTED and Defendant/Counterclaimant Progressive Northwestern Insurance Company Motion for Summary Judgment (Doc. 16) is DENIED.

The Clerk of Court is directed to enter judgment in favor of Fettkether and close the case.

DATED the __9th__ day of January, 2024.

SUSAN P. WATTERS
U.S.  DISTRICT JUDGE